# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| ISONOVA TECHNOLOGIES LLC, <br><br> Plaintiff, <br><br> v. <br><br> DAVID L. RETTIG <br> Serve at: 6934 Frank Lloyd Wright Avenue <br> Middleton, WI 53562-5117 <br><br> and <br><br> OVAINNOVATIONS, LLC, <br> Serve Registered Agent William J. Daly <br> 115 3rd Street, SE <br> Suite 500 <br> Cedar Rapids, IA 52401 <br><br> Defendants. | Case No. <br><br> **COMPLAINT** |

Plaintiff IsoNova Technologies LLC ("IsoNova"), for its Complaint against Defendants David L. Rettig ("Rettig") and OvaInnovations, LLC ("OvaInnovations") states and alleges as follows:

**Parties**

1. Plaintiff IsoNova is a Delaware limited liability company with its principal place of business at 3801 E. Sunshine, Springfield, MO 65809. IsoNova is licensed to do business in the State of Iowa.

2. Upon information and belief, Defendant Rettig is an individual currently residing in Middleton, Wisconsin, in the County of Dane. He is a former employee of Rembrandt Enterprises, Inc. ("Rembrandt") and a former member of the Board of Managers of Plaintiff IsoNova.

3. OvaInnovations is an Iowa limited liability company doing business in the State of Iowa with its registered office at 115 3rd Street, SE, Suite 500, Cedar Rapids, IA 52401. Rettig and OvaInnovations are collectively referred to herein as "Defendants."

## Jurisdiction and Venue

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and is between citizens of different states.

5. This Court has personal jurisdiction over Defendant OvaInnovations because OvaInnovations is a resident of the State of Iowa. This Court has personal jurisdiction over Defendant Rettig because Rettig conducted business in Iowa, committed torts in Iowa, and, upon information and belief, entered into contracts to be performed in whole or in part in the State of Iowa that give rise to the causes of action set forth herein.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to IsoNova's claims occurred in this judicial district.

## General Allegations

**IsoNova's Business and the Secrecy it Maintains**

7. IsoNova is an innovative egg product manufacturer with multiple production facilities throughout the United States. Heavily summarized, IsoNova takes what would otherwise be waste, inedible, or unsaleable egg products ("Egg Product") from egg producers and transforms the Egg Product to manufacture various value-added egg products that are used in the manufacture of pet food and animal feed.

8. Egg producers must dispose of Egg Product, and the requirements for doing so vary from state to state. Not all egg producers are willing to rely on a third party, such as IsoNova, to manage their Egg Product disposal. IsoNova has spent decades of time and significant resources

developing individual relationships with egg producers who will allow IsoNova to place equipment in their facilities and to remove their Egg Product.

9. Not all Egg Product is appropriate for use in IsoNova's value-added products. Depending on the production facility, hen, and production process, eggs have different amino acids, protein contents, and pH levels. To determine if the Egg Product generated at a production facility is adequate for IsoNova's needs, IsoNova conducts an analysis of the protein content and the composition of the Egg Product generated by the facility. IsoNova only contracts for Egg Product with those egg producers whose Egg Product meets IsoNova's exacting standards.

10. When seeking Egg Product suppliers, IsoNova applies more than 30 years of industry knowledge developed through itself and its predecessor, including but not limited to knowledge of individual egg producers' available volume of Egg Product, knowledge of the protein content and composition of individual producers' Egg Product obtained through scientific analysis, and the willingness of the producer to rely on a third party for its Egg Product removal needs. Through this extensive analysis, investigation, relationship building, and depth of knowledge, IsoNova has identified and contracted with select egg producers to provide Egg Product.

11. IsoNova relies on its suppliers to meet its customers' needs. Based on the volume of Egg Product and the specific protein content and composition of the contracted-for Egg Product available from its suppliers, IsoNova enters into contracts to supply certain volumes of value-added products to its customers. Thus, IsoNova relies on its suppliers to fulfill the terms of their contractual commitments in order to meet their own customer contracts.

4818-9343-4305.3

12. If IsoNova does not obtain the contracted-for amount of Egg Product from its suppliers, IsoNova either cannot comply with its contractual commitments to its customers or can do so only at a significantly increased cost.

13. In reliance on its supplier contracts, IsoNova also contracts with third-party transportation companies to transport the Egg Product. If IsoNova's suppliers do not provide the contracted-for Egg Product, IsoNova cannot meet its contractual obligations to its transportation providers.

14. Two of IsoNova's Egg Product suppliers are Company A and Company B.[1] IsoNova has been doing business with Company A and Company B for many years without interruption. IsoNova has written agreements with Company A and Company B to purchase their Egg Product. Those agreements set forth certain pricing for the Egg Product on an amount per pound basis and include product specifications and annual automatic renewal provisions. The supply contracts with Company A and Company B can only be terminated by either party giving a minimum of 120 days advanced written notice prior to annual renewal, which is the absolute minimum time it would take IsoNova to source alternative Egg Product, albeit at a significantly greater cost to IsoNova. The supplier contracts also contain express confidentiality provisions.

15. Given the time and effort expended in locating and contracting for Egg Product that meets IsoNova's protein and composition requirements, information regarding IsoNova's suppliers, including the suppliers' volume of Egg Product generation, the composition and protein levels of available Egg Product, and pricing terms ("Supplier Information"), is a heavily guarded

---

[1] The identities of IsoNova's suppliers are being kept confidential due to the commercially sensitive nature of the suppliers' relationship with IsoNova.

secret. While IsoNova's suppliers are generally known in the industry as egg producers, the Supplier Information is not generally known or readily ascertainable by proper means.

16. IsoNova's business and competitive advantage is premised on the confidentiality of its operations, including but not limited to: its Supplier Information; its margins and profitability; its production and manufacturing processes; and research and development related to Egg Product and Egg Product procurement (hereafter, this non-exclusive list is referred to as the "Competitively Sensitive Information").

17. IsoNova undertakes numerous efforts to maintain the secrecy of its Competitively Sensitive Information. For example:

    a. IsoNova maintains different levels of access to its electronically stored information. All Competitively Sensitive Information is kept strictly confidential. Only those IsoNova employees with a need to know specific Competitively Sensitive Information to perform their jobs are made privy to that information;

    b. IsoNova's pricing and profit margin information is kept strictly confidential and is accessible only to those with a need to know in order to perform their job duties;

    c. All IsoNova employees are required to sign a confidentiality agreement;

    d. IsoNova management and executive officers are required to sign non-competition agreements;

    e. All non-employees must sign a confidentiality agreement prior to entering any IsoNova facility and must be escorted by an IsoNova employee at all times;

    f. No photographs or video recordings are permitted within IsoNova's facilities;

4818-9343-4305.3

g.  IsoNova's manufacturing facilities are monitored by cameras to ensure that security is maintained;

h.  IsoNova's supplier contracts contain express confidentiality provisions;

i.  IsoNova's transportation contracts contain express confidentiality provisions;

j.  IsoNova's facilities are secured and either require a keycard to enter or require entering through a locked reception area; and

k.  All IsoNova electronic devices require a unique password to access, and employees are prohibited from sharing their password with others.

18. Much of the Competitively Sensitive Information also constitutes trade secrets because the information has independent economic value by virtue of the fact that it is not generally known to or readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.

**Rettig's Employment with Rembrandt and His Access to Competitively Sensitive Information**

19. In 2014, IsoNova was formed by American Dehydrated Foods, Inc., which had been in the Egg Product business for decades, and Rembrandt, which was in the business of edible eggs and had been a supplier of Egg Product to American Dehydrated Foods, Inc. American Dehydrated Foods, Inc. and Rembrandt became the members of IsoNova. That co-ownership and the terms of IsoNova's operations were memorialized in the IsoNova Operating Agreement.

20. IsoNova is managed by a Board of Managers.

21. Rettig signed the Operating Agreement as President of Rembrandt. He also was appointed as one of Rembrandt's Designated Representatives to serve on the Board of Managers of IsoNova.

22. Rettig also signed the Operating Agreement as a Manager of the Board of Managers. In so doing he asserted that he had "reviewed and acknowledged" the terms of the Operating Agreement.

23. Article 6.9(a) of the Operating Agreement states:

The Members have agreed that the formation of the Company to pursue the research, development, manufacture and sale of Inedible Egg Products for the pet food and animal feed industry will increase efficiencies and bring new Inedible Egg Products to market quicker and in larger quantities than either Member could do independently. Each Member agrees that neither the Member nor its affiliates will engage, directly or indirectly, outside of the Company, in any business venture involving the research, development and manufacture within the United States, and the marketing and sale both domestically and internationally, of any Inedible Egg Products for the pet food and animal feed industry …, without the prior written consent of the Company ….

24. Article 6.9(g) of the Operating Agreement states:

All non-public information regarding [IsoNova], the Board and the Members will be treated with confidentiality by [IsoNova], the Board and the Members, and will not be disclosed by [IsoNova], the Board or the Members to third parties (other than as necessary in the ordinary course of and to further the Business) without the prior written consent of the Board; provided, however, [IsoNova], the Board and the Members may disclose such information to their respective attorneys, accountants and other professional advisors who have a need for such information provided that such persons are informed of the confidential nature of the information and are directed to maintain the confidentiality thereof. The confidentiality obligations of each Member will survive any termination of the membership of such Member in [IsoNova]. The confidentiality obligations of the Board will survive any termination of such status.

25. In his capacity as a Manager, Rettig was given access to confidential, proprietary and trade secret information, including but not limited to Competitively Sensitive Information. Rettig needed access to this information to perform the essential functions of his job and to comply with his fiduciary obligations as a Manager on the Board of Managers.

26. Rettig was a member of IsoNova's Board of Managers from its inception until November of 2018.

27. The Board of Managers met regularly throughout Rettig's tenure on the Board. Prior to and during each Board meeting, Managers were provided confidential information, both verbally and through written materials, that included detailed Competitively Sensitive Information. Thus, in his role as a Manager on the Board of Managers, Rettig had direct knowledge of IsoNova's Competitively Sensitive Information, including but not limited to its Supplier Information, margins, profitability, research and development efforts and results, manufacturing processes, projections, and opportunities for growth and/or expansion. This information was provided to IsoNova's Board of Managers, including Rettig, to allow them to carry out their duties as Managers.

28. Rettig visited IsoNova facilities on numerous occasions. Each time, he was required to sign a confidentiality agreement upon entering.

29. In 2014, IsoNova also entered into a License Agreement with Rembrandt. By virtue of the License Agreement, Rembrandt agreed to license to IsoNova certain of Rembrandt's "technologies, processes and related know how used for the production of inedible egg product for the pet food and animal feed markets."

30. Upon information and belief, as a Manager of IsoNova and President of Rembrandt, Rettig was aware of and approved of the License Agreement between IsoNova and Rembrandt.

31. The License Agreement provides that IsoNova and Rembrandt, and their "agents, employees, officers, managers, consultants and representatives":

> shall not divulge, communicate, use to the detriment of [IsoNova], its divisions, subsidiaries and affiliates, or for the benefit of any other person, firm, partnership, business, or corporation, or otherwise misuse any of the information, business information, data, or trade secrets which are proprietary or confidential to [IsoNova], its divisions, subsidiaries and affiliates ("Confidential Information") including but not limited to, any manufacturing processes and methods, technical data, supplier lists, cost or pricing information, historical data, business practices, or any other business information or records of [IsoNova]…

32. The License Agreement goes on to state that each agent, employee, officer, manager, consultant or representative of Rembrandt "who is exposed to, will obtain or have access to Confidential Information … shall sign an agreement in the form of Exhibit C…(which shall include, at a minimum, all employees of [Rembrandt])" promising to keep IsoNova's Confidential Information, as defined by the License Agreement, strictly confidential. As the President of Rembrandt, Rettig was required to sign an agreement in the form of Exhibit C to the License Agreement.

33. Exhibit C to the License Agreement defines "Confidential Information" as:

> any information of a private, secret or confidential nature concerning [IsoNova], whether now existing or hereinafter developed, and includes, but is not limited to, (i) [IsoNova's] research, trade secrets, databases, financial information, "know how", methodologies, supplier lists, techniques, procedures, pricing, business plans, or accounting; (ii) information or materials which relate to [IsoNova's] research, technology, trade secrets, discoveries and the nature and results of research and development activities, and proprietary information not known generally in the community…

34. Exhibit C to the License Agreement also states that:

> Confidential Information was developed and will be developed by [IsoNova] at great expense and constitutes trade secrets and proprietary information of [IsoNova]. In addition, IsoNova's business is dependent upon being able to adequately keep its employees from using and/or disclosing Confidential Information…except as expressly permitted hereunder.

35. As the President of Rembrandt and Manager of IsoNova, Rettig knew and understood that he would "come into contact with Confidential Information," and that during and after his employment he would: (a) "keep secret all Confidential Information and not reveal or disclose it to anyone outside of IsoNova, except with IsoNova's prior written consent;" (b) "not make use of any Confidential Information for any purpose other than as required to perform services for IsoNova"; and (c) "deliver promptly to IsoNova," upon request, "all software, data,

Page **9** of **20**
4818-9343-4305.3
Case 1:20-cv-00071-CJW-KEM    Document 1    Filed 07/29/20    Page 9 of 20

memoranda, notes, records and other documents (and all copies thereof) constituting or relating to such Confidential Information which [he] may then possess."

36. Exhibit C to the License Agreement also provides that "[IsoNova] shall be entitled to reasonable attorneys fees and costs associated with any action to enforce the provisions hereof."

**Rettig Begins Competing with IsoNova and Interfering with its Suppliers**

37. In November 2018, Rettig was terminated from Rembrandt and was removed as a Manager of IsoNova.

38. On January 22, 2020, less than two years after Rettig was terminated from Rembrandt and removed from the IsoNova Board of Managers, Rettig formed OvaInnovations. Upon information and belief, Rettig is the President and CEO of OvaInnovations. Since the formation of OvaInnovations, Rettig has taken the actions outlined herein in both his individual capacity and on behalf of OvaInnovations.

39. Upon information and belief, Defendants are using IsoNova's Competitively Sensitive Information to develop a platform to directly compete with IsoNova.

40. In attempting to compete with IsoNova, Defendants already have improperly used confidential and trade secret information Rettig obtained by virtue of serving as a Manager on the IsoNova Board of Managers and, upon information and belief, Defendants intend to continue using IsoNova's confidential and trade secret information for their own competitive advantage.

41. After forming OvaInnovations, Defendants reached out to at least two of IsoNova's key suppliers – Company A and Company B – by and through Rettig.

42. Defendants disclosed Competitively Sensitive Information regarding IsoNova to Company A and Company B. For example, Defendants told Company A and Company B information regarding IsoNova's pricing, profits, and margins. Defendants revealed this

information for the sole purpose of inducing Company A and Company B to terminate their existing contractual agreements with IsoNova and to prevent Company A and Company B from continuing their ongoing business relationship with IsoNova.

43. Upon information and belief, Defendants have offered to purchase from Company A and Company B the same volume of Egg Product IsoNova has been purchasing from Company A and Company B under its ongoing contractual agreements. Further, upon information and belief, Defendants offered to provide Company A and Company B a significant financial incentive to breach their agreements with IsoNova and instead to provide their Egg Product to OvaInnovations.

44. After speaking with Defendants, Company A and Company B both sent letters to IsoNova purporting to terminate their agreements. Those notices were sent less than 120 days prior to the anniversary of their agreements. As such, both agreements renewed for an additional term. Notwithstanding this, Company A and Company B have stated that they intend to stop supplying Egg Product to IsoNova, in violation of their contractual obligations. IsoNova convinced Company A and Company B to honor their agreement with IsoNova through the end of its current term. Company A and Company B have advised IsoNova that while they will honor the current term of the parties' agreement, they will cancel the contract thereafter because of the information Rettig disclosed to them, thus terminating a multi-year relationship between them.

45. Company A and Company B told IsoNova that Defendants shared Competitively Sensitive Information with them, including its Supplier Information (to which Company A and Company B were not privy and which was held in strict confidence within IsoNova) and IsoNova's margins on specific products.

46. Defendants communicated with another long-term IsoNova supplier, Company C. Company C told IsoNova they had been contacted by Defendants, and Defendants shared with Company C IsoNova's Competitively Sensitive Information. As a direct result of Defendants' unauthorized disclosures, Company C has made clear to IsoNova that they intend to exact a higher price from IsoNova for their future supply of Egg Product.

47. Rettig learned Supplier Information about Company A, Company B, and Company C by virtue of his receiving Competitively Sensitive Information while serving on IsoNova's Board of Managers, and OvaInnovations learned this information from Rettig.

48. Rettig only learned of IsoNova's pricing and profit margins by virtue of his receiving Competitively Sensitive Information while serving on IsoNova's Board of Managers, and OvaInnovations learned this information from Rettig.

49. Rettig was under a duty to maintain the secrecy of IsoNova's Competitively Sensitive Information, and OvaInnovations knew Rettig had obtained and disclosed IsoNova's Competitively Sensitive Information while he was under a duty to maintain its secrecy.

50. Upon information and belief, Defendants have disclosed and used other Competitively Sensitive Information belonging to IsoNova for which Rettig has a duty to maintain secrecy and for which OvaInnovations knew Rettig was under a duty to maintain secrecy.

51. Upon information and belief, Rettig has or intends to disclose IsoNova's Competitively Sensitive Information and to interfere with IsoNova's business relationships with suppliers other than Company A, Company B and Company C.

52. Upon information and belief, Defendants' disclosure of Competitively Sensitive Information has included or will include the disclosure of confidential information regarding IsoNova's customers, with whom IsoNova owes various duties of confidentiality. The cessation

of Defendants' activities, therefore, is vital not only to maintaining the confidentiality of IsoNova's Competitively Sensitive Information, but also to ensuring that Defendants do not cause a breach of IsoNova's obligations to its customers.

53. Upon information and belief, Defendants also have reached out to one of IsoNova's chief research and development consultants seeking his help to make use of Competitively Sensitive Information about IsoNova's products and processes.

## **FIRST CAUSE OF ACTION**
**(Misappropriation of Trade Secrets against Defendants)**

54. IsoNova incorporates paragraphs 1 through 53 above as though fully set forth herein.

55. IsoNova is a leading supplier of products manufactured using Egg Product. Through years of work and millions of dollars in research and development, IsoNova has developed Competitively Sensitive Information, including compilations, processes, methods, and techniques that provide IsoNova an advantage over its competitors. IsoNova's Competitively Sensitive Information, including compilations, processes, methods, and techniques, have independent economic value because they are not generally known to or readily ascertainable by proper means by those able to obtain economic value from their disclosure or use (hereafter, the "Trade Secrets".)

56. IsoNova employs efforts that are reasonable under the circumstances to maintain the secrecy of its Trade Secrets, as set forth in part above.

57. As a Manager of IsoNova and the President of Rembrandt, Rettig was given access to certain IsoNova Trade Secrets, including but not limited to: pricing negotiated with its suppliers; the terms of IsoNova's relationship with its suppliers; the protein content and composition of individual suppliers' Egg Product; the volume of Egg Product available from individual suppliers;

IsoNova's margins and profitability on specific products and as a whole; its production and manufacturing processes; and research and development related to egg production facilities, Egg Product procurement, and production and manufacturing processes using Egg Product. As a former Manager of IsoNova and the former President of Rembrandt, Rettig has an ongoing duty to maintain the secrecy of IsoNova's Trade Secrets and not to use IsoNova's Trade Secret information for his own benefit or the benefit of any third party, including but not limited to OvaInnovations.

58. Rettig acquired IsoNova's Trade Secrets under circumstances requiring their secrecy to be maintained or their use limited.

59. OvaInnovations knew that the Trade Secrets were derived from Rettig and that Rettig acquired those Trade Secrets under circumstances requiring that their secrecy be maintained, or their use limited.

60. Rettig and OvaInnovations knew that Rettig's disclosure of IsoNova's Trade Secrets to OvaInnovations, Company A, Company B, and Company C was and is improper.

61. Rettig and OvaInnovations knew that their use of IsoNova's Trade Secrets was and is improper.

62. Rettig disclosed IsoNova's Trade Secret information to OvaInnovations. Defendants then used and disclosed IsoNova's Trade Secret information to, at minimum, Company A, Company B, and Company C for the purpose of interfering with IsoNova's contracts and business expectancy with Company A, Company B, and Company C. Thus, Defendants used and are continuing to use IsoNova's Trade Secrets for their own benefit and gain and with knowledge that the use was and is improper in that it was and is in breach of a duty to maintain secrecy.

63. Defendants' actions constitute misappropriation of IsoNova's Trade Secrets in violation of Iowa's Uniform Trade Secret Act, IA ST § 550, *et seq.*

64. Defendants are using, at a minimum, IsoNova's Supplier Information, pricing and margins, and the results of its research and development efforts—each of which represents a compilation of information that independently constitutes at least one Trade Secret—for their own benefit and to the competitive disadvantage of IsoNova.

65. Defendants' misappropriation of IsoNova's Trade Secrets has and will cause irreparable harm to IsoNova unless and until enjoined by this Court. By disclosing and using IsoNova's Trade Secrets, Defendants' actions threaten to prevent IsoNova from meeting its contractual obligations to its customers, transportation companies, and others. Their disclosure also may cause a breach of IsoNova's confidentiality obligations to its customers. IsoNova has no adequate remedy at law for the injuries currently being suffered and the additional injuries that are threatened. Defendants will continue to misappropriate IsoNova's Trade Secrets unless and until enjoined by this Court.

66. IsoNova has been and is continuing to be damaged by Defendants' misappropriation of its Trade Secrets and is entitled to an award of its actual loss and the unjust enrichment caused by the misappropriation to the extent it exceeds IsoNova's actual loss or, in the alternative, a reasonable royalty.

67. IsoNova is entitled to an award of double its actual damages as provided by IA ST § 550.4(2).

68. IsoNova is entitled to recover its attorneys' fees and costs incurred herein pursuant to IA ST § 550.6(3).

69. Defendants' misappropriation was and is willful and malicious.

## SECOND CAUSE OF ACTION
### (Breach of Confidentiality Agreements against Rettig)

70. IsoNova incorporates paragraphs 1 through 69 above as though fully set forth herein.

71. Rettig signed numerous documents in connection with his service as a Manager of IsoNova and as President of Rembrandt, including the Operating Agreement, Exhibit C to the Licensing Agreement, and Confidentiality Agreements prior to entering IsoNova's facilities.

72. By signing these documents, Rettig agreed, amongst other things, to keep IsoNova's Competitively Sensitive Information secret, to not reveal or disclose it to anyone outside of IsoNova, and not to make use of any Competitively Sensitive Information, including but not limited to such information that does not rise to the level of a Trade Secret, for any purpose other than as required to perform services for IsoNova.

73. At a minimum, Rettig disclosed IsoNova's Competitively Sensitive Information to OvaInnovations, Company A, Company B, and Company C. These disclosures were not made in furtherance of Rettig's services to IsoNova, but for the purpose of interfering with, at minimum, IsoNova's business relationships and expectancies with Company A, Company B, and Company C.

74. Rettig's disclosures constitute a breach of his contractual obligations to IsoNova.

75. Rettig's breaches have and will cause irreparable harm to IsoNova unless and until enjoined by this Court. IsoNova is threatened with the loss to a competitor of its Competitively Sensitive Information, including but not limited to such information that does not rise to the level of a Trade Secret, the loss of or increased expense to maintain supplier relationships, and the loss of customer relationships. IsoNova has no adequate remedy at law for the injuries currently being

suffered and the additional injuries that are threatened. Rettig will continue to breach his contractual obligations to IsoNova unless and until enjoined by this Court.

76. IsoNova has been and is continuing to be damaged by Rettig's breach of his confidentiality obligations to IsoNova in an amount to be proven at trial.

## **THIRD CAUSE OF ACTION**
### (Tortious Interference with Business Expectancy Against Defendants)

77. IsoNova incorporates paragraphs 1 through 76 above as though fully set forth herein.

78. IsoNova has ongoing business relationships and business expectancies with Company A, Company B, and Company C for the purchase of Egg Product needed to manufacture IsoNova's products beyond the current terms of its contracts with Company A, Company B, and Company C.

79. Defendants knew of IsoNova's business expectancies with Company A, Company B, and Company C.

80. Defendants intentionally and improperly interfered with IsoNova's business expectancies with Company A, Company B, and Company C by sharing IsoNova's confidential, proprietary, and trade secret information with them and inducing them to cease, significantly curtail, or alter the terms of their business relationships with IsoNova.

81. The Defendants' interference caused Company A, Company B, and Company C to alter their business relationships with IsoNova to IsoNova's detriments and at a significant cost to IsoNova.

82. Defendants' interference has prevented IsoNova from continuing their reasonably expected ongoing business relationships with Company A, Company B, and Company C and has caused IsoNova to incur substantially increased costs to procure Egg Product.

Page **17** of **20**
4818-9343-4305.3

Case 1:20-cv-00071-CJW-KEM   Document 1   Filed 07/29/20   Page 17 of 20

83. Given that IsoNova had long-term business relationships with Company A, Company B, and Company C, IsoNova had a reasonable business expectancy that Company A, Company B, and Company C would continue acting as Egg Product suppliers to IsoNova in the same manner they had in the past but for Defendants' interference. Furthermore, Company A and Company B told IsoNova they would no longer supply Egg Product to IsoNova after their current contract terms, and Company C told IsoNova that any future supply of Egg Product would be at a substantially increased cost to IsoNova, because of the Competitively Sensitive Information that Defendants improperly disclosed to Company A, Company B and Company C. Upon information and belief, Defendants used IsoNova's confidential, proprietary, and trade secret information to offer Company A, Company B and Company C a greater financial incentive than that negotiated between IsoNova and Company A, Company B and Company C to procure their Egg Product.

84. In reliance on its expected business relationships with Company A, Company B, and Company C, IsoNova entered into contracts with transportation companies to haul Egg Product from their facilities and entered into contracts with customers to supply certain volumes of IsoNova products.

85. As a result of Defendants' actions, IsoNova has been and will continue to be damaged. These damages include but are not limited to potential unfulfilled customer contracts, increased costs to procure Egg Product, and costs related to IsoNova's contracts with transportation companies to haul Egg Product from Company A's, Company B's, and Company C's facilities.

86. IsoNova's damages by Defendants' interference with its business expectancy with Company A, Company B, and Company C, which will be proven at trial, are in the millions of dollars per year for the duration of the reasonably expected life of the relationships.

WHEREFORE, Plaintiff IsoNova Technologies, LLC prays that this Court:

1. Temporarily, preliminarily and permanently enjoin Defendants from:

   a. Obtaining, accessing, using, retaining or disclosing any IsoNova confidential, proprietary or trade secret information;

   b. Accessing, copying, transmitting or disseminating any hard copy or electronic copy of any data or documents containing IsoNova confidential, proprietary or trade secret information;

   c. Deleting, destroying, altering, erasing or otherwise modifying or causing or permitting anyone else to delete, destroy, alter, erase or otherwise modify any evidence relating to their misconduct and/or to this action; and

   d. Reconstituting any portion of IsoNova's confidential, proprietary or trade secret information;

2. Order the immediate return to IsoNova of all misappropriated trade secret and/or proprietary or confidential information;

3. Find that Defendants willfully misappropriated IsoNova's Trade Secrets and double the award provided pursuant to IA ST § 550.4(2);

4. Find that Defendants engaged in willful and malicious misappropriation of trade secrets and award IsoNova its attorneys' fees and recoverable costs pursuant to IA ST § 550.6(3);

4818-9343-4305.3

5. Award IsoNova damages for Defendants' misappropriation as set forth in IA ST § 550.4, including IsoNova's actual loss and the unjust enrichment caused by the misappropriation to the extent it exceeds actual loss, or in the alternative, a reasonable royalty;

6. Award IsoNova damages for Rettig's breach of contract;

7. Award IsoNova its attorneys' fees for Rettig's breach of contract;

8. Award IsoNova actual and compensatory damages for Defendants' tortious interference with business expectancy;

9. Award IsoNova punitive damages according to proof;

10. Award IsoNova pre- and post-judgment interest according to proof; and

11. For such other and further relief as the Court deems just and proper.

Dated: July 29, 2020

KUTAK ROCK LLP

By: /s/ Kathryn E. Jones
Kathryn E. Jones   IA#17224
1650 Farnam Street
The Omaha Building
Omaha, NE 68102-2103
Telephone: (402) 346-6000
Facsimile: (402) 346-1148
Kate.jones@kutakrock.com

Juliet A. Cox, MO #42566, *pro hac vice pending*
Anna M. Berman, MO #61637, *pro hac vice pending*
2300 Main Street, Suite 800
Kansas City, MO 64108-2432
Telephone: (816) 960-0090
Facsimile: (816) 960-0041
juliet.cox@kutakrock.com
anna.berman@kutakrock.com

ATTORNEYS FOR PLAINTIFF
ISONOVA TECHNOLOGIES, LLC